**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

FILED & ENTERED

JUN 12 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gasparis DEPUTY CLERK

In re:

Lenny Kyle Dykstra

                                    Debtor(s).

Lenny Kyle Dykstra

                                    Plaintiff(s),

    v.

Firemans Fund Insurance Company and
Associated Indemnity

                                    Defendant(s).

Case No.:  1:09-bk-18409-GM

Adv No:   1:10-ap-01516-GM

Chapter 7

**MEMORANDUM OF OPINION CONCERNING CONTINUED MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE AS TO THE SECOND AND THIRD CLAIMS FOR RELIEF**

Date: May 29, 2012
Time: 10:00 a.m.
Courtroom: 303

**NEW STATUS CONFERENCE HEARING**

**Date: July 24, 2012 at 10:00 a.m.**

The factual background that led to this complaint is set forth in the Memorandum of Opinion on the Fireman's Fund Motion to Dismiss, filed on June 9, 2011.[1]  The Court dismissed the first and second claims for relief without leave to amend (breach of contract and bad faith) and dismissed the third, fifth and sixth claims for relief with leave to amend (unfair business practices, intentional infliction of emotional distress, and violation of the automatic stay).  As to the fourth claim for relief (fraudulent concealment), the court granted the motion to dismiss without leave to amend unless Dykstra was able to plead, based on a good faith factual basis, that Bruce Friedman, the court appointed expert, had personally represented Fireman's Fund (FFIC) on or

---

[1] Doc. #21.  Unless otherwise noted, all docket numbers referred to are in Adv. 1:08-01434.

before March 5, 2010, that the insurers or their counsel knew of this and intentionally

concealed it, that Plaintiff would have acted differently had he known of this, and that

Plaintiff suffered damages as a result of this concealment by insurers or their counsel.[2]

On August 8, 2011, FFIC filed a second Motion to Dismiss based on Plaintiff's

failure to timely file an amended complaint.[3]  Due to Dykstra's incarceration, the Court

extended the time to file the amended complaint and on October 31, 2011 Plaintiff filed

a First Amended Complaint, which included claims for violation of Business &

Professions Code §17200, et. seq, fraudulent concealment, intentional infliction of

emotional distress, and violation of the automatic stay.[4]  On December 5, 2011, FFIC

filed the current Motion to Dismiss or, in the Alternative, For Summary Judgment or

Partial Summary Judgment.[5]  At the same time, FFIC filed its Motion to Strike Portions

of the First Amended Complaint.[6]

On February 29, 2012, the Court issued its Memorandum of Opinion as to these

motions and continued the hearing.[7]  The Court granted the Motion to Dismiss with

prejudice as to the first claim for relief (unfair business practices) and denied the motion

to dismiss as to the fourth claim for relief (violation of the automatic stay).  It continued

the hearing as to the second claim for relief (fraudulent concealment) in order to allow

Plaintiff an opportunity to conduct discovery as to Friedman's personal representation of

FFIC.  It also continued the hearing as to the third claim for relief (post-petition

emotional distress) because that claim relies on the second claim for relief.

Although not done timely, Plaintiff's counsel obtained documents and deposed

---

[2] Doc. #20.  March 5, 2010 was the final hearing on the settlement motion.
[3] Doc. #24.
[4] Doc. #34.
[5] Doc. #43.
[6] Doc. #46.
[7] Doc. #59.

Friedman and has now filed a Supplemental Opposition to the Motion to Dismiss or for Summary Adjudication (Supplemental Opposition) as to the second and third claims for relief.[8]

The court will rule on this as a Motion for Summary Judgment or Partial Adjudication, since it depends on evidence that is external to the First Amended Complaint itself.[9]  The required elements to prove fraudulent concealment are that (1) FFIC intentionally failed to disclose an important fact to Dykstra, (2) Dykstra did not know of that concealed fact, (3) by concealing the fact FFIC intended to deceive Dykstra, (4) Dykstra reasonably relied on FFIC's deception, (5) Dykstra was harmed by FFIC's deception, and (6) FFIC's concealment was a substantial factor in causing Dykstra's harm.[10]  A claim for fraudulent concealment would also arise to the extent that FFIC concealed the important fact(s) from the Court so that it would rule in favor of the settlement.  In this case, the alleged important fact was that Friedman had personally represented FFIC before March 5, 2010.[11]

Given the stage of discovery, at this point in time the Court is only dealing with items #1 and #2.  The intent of FFIC to deceive, reasonable reliance and actual damages would likely require further discovery and expert testimony and it is premature to require expenditure of the expense that this would involve.

---

[8] Doc. #62.

[9] The court has discretion to accept evidence on a motion to dismiss and convert the motion to one for summary judgment or partial summary adjudication, after giving all parties a reasonable opportunity to present all material relevant to the motion. Fed. Rule of Civ. Proc. 12(d), incorporated by Fed. Rule of Bank. Proc. 7012. Swedberg c. Marotzke, 339 F.3d 1139 (9th Cir. 2003).  The Court gave the parties notice of its intent to treat this as a motion for summary judgment in its Memorandum of Opinion (Doc. #59).

[10] Calif. Civil Jury Instructions (CACI) 1901, based on Cal. Civ. Code §1710.

[11] The issue argued up to this point has been personal representation, but the current opposition is that Friedman/FFIC failed to reveal that there was a concurrent representation of FFIC by another attorney in Friedman's firm, that the firm does not generally represent plaintiffs who are suing insurance companies, and that Friedman is an equity partner in the firm.  This is discussed in detail later in this memorandum.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The crux of the Supplemental Opposition is that although there is no evidence that Friedman personally represented FFIC before March 5, 2010, he is an equity partner in his law firm (Bingham McCutchen hereinafter referred to a Bingham); the law firm not only represented FFIC in the past, but did so simultaneously with Friedman's tenure as an independent expert in the Dykstra case; Friedman knew that he could not ethically serve as an independent expert witness under these circumstances; and Dykstra was never made aware of this actual conflict.  Further, FFIC was aware of all of this and although it waived the conflict, Dykstra did not.

There is no evidence presented that Friedman ever personally represented FFIC and Plaintiff relies on Friedman's relationship to his law firm.  There is no dispute that the Bingham firm has represented FFIC and apparently there was at least one defense case in which Bingham was representing FFIC at the time of Friedman's participation in the Dykstra case.  However there is also no dispute that Friedman had no involvement in this other lawsuit, which appears to have been handled by another attorney out of the Bingham San Francisco office.

As noted at the oral argument on May 29, 2012, the issue here is not whether an actual or potential conflict existed, but whether the relationship of Friedman and of his law firm to FFIC were concealed and whether FFIC was involved in that concealment so as to defraud Dykstra. Plaintiff sets forth no new evidence that Friedman personally represented FFIC or of actual concealment or of fraudulent concealment.[12]  The issues raised in the Plaintiff's Supplemental Opposition filed May 25, 2012 are set forth below.[13]

---

[12] The Court has already thoroughly dealt with the issue of conflict of interest and disqualification and merely incorporates this by reference in this Memorandum. Doc. #59, p. 5-11.  But for ease of the reader, the relevant portion concerning the claim for fraudulent concealment and appointment of Friedman is attached hereto.
[13] Doc. #62.

1

2

3

ISSUE:  It was an actual conflict of interest for Friedman to serve as an expert because

Bingham was concurrently representing FFIC in other matters.

4

5

6

7

8

9

10

11

12

   PROFFERED EVIDENCE: Friedman admitted this in his deposition.  He may or

may not have known that there was an FFIC active case in the office at that time, but he

acted as though there was.[14]  Bingham opened this as a firm file and the conflict letter

was not just for Friedman, but was actually a waiver of conflict as to the Bingham firm.[15]

Friedman was an equity partner in Bingham.[16] Terry Houlihan, another Bingham

partner, was concurrently representing FFIC in a separate matter not involving

Dykstra.[17]

13

14

15

   UNSUPPORTED ARGUMENT:  As part of the presentation, Plaintiff puts forth

some statements as "facts," which are not supported by the evidence which Plaintiff is

placing before the Court.

16

17

18

19

20

   In the Supplemental Opposition, Plaintiff asserts that "according to Mr. Friedman,

Bingham's 'client' was the Court concurrently with Fireman's Fund."[18]  This cites to

Friedman testimony in Ex. A, p. 60:1-3.  However, this is not what Friedman testified to.

He stated several places that originally his client had been the Trustee [not FFIC] and

21

22

23

24

25

26

27

28

---

[14] Doc. #62, Ex. A.  Various testimony at Friedman's deposition shows that he may have received a conflict check from his firm (and probably did), but even without that he decided to treat this as if there were a conflict due to a concurrent representation.  Ex. A, p. 30:11-17, p. 46:5-15, p. 73:20-74:6; p. 75:13-25.  Although Plaintiff asserts that FFIC and Bingham are hiding something because Bingham has refused to turn over its conflicts documentation (Doc. #62, p. 4, fn 2), because there is no dispute that Bingham lawyers had and were representing FFIC and would probably do so in the future and because Friedman acted as if there were an actual concurrent representation, the Court finds that documentary evidence to prove this would be irrelevant.

[15] Doc. #62, Ex. K.  Ex. A, p. 57:4-8.

[16] Doc. #62, Ex. A, p. 10:19-23.

[17] The Court is given no cite to specific evidence on this, but it appears from Doc. #62, Ex. A, p. 54:25-55:2 that Mr. Houlihan was in the Bingham firm's San Francisco office and was representing FFIC in an unrelated case at that time.

[18] Doc. #62, p. 9:4-5.

1   later he found out that it was the Court.[19]

2       In the introductory summary to the Supplemental Opposition, Plaintiff argues that

3   Friedman was concerned about what Bingham partners would think if Friedman gave

4   negative or adverse testimony about FFIC.  The only evidence put forward in support of

5   this statement seems to be that referred to on p. 10:22 – 11:5 of the Supplemental

6   Opposition.  However the deposition cites given in the Supplemental Opposition only

7   show that Friedman was aware that he might have to offer testimony that was adverse

8   to a client of the Bingham firm and that is why he asked for the conflict waiver.  As to

9   any other FFIC cases in the firm, he felt that it would be up to FFIC to discuss the

10  ramifications of the conflict with the attorney(s) handling those cases.[20]  He never

11  mentions that he considered the attitudes of other Bingham partners.

14

15  ISSUE:  FFIC's counsel deliberately concealed Friedman's conflicts from Dykstra and

16  the Court because they knew that Friedman would be loyal to FFIC as an expert.

17      PROFFERED EVIDENCE:  Dykstra was never given a conflict of interest waiver.

18  Counsel for FFIC told Dykstra that Friedman was an "appointed independent" third party

19  expert.[21]  The Trustee only advised Dykstra of "potential" conflicts, not actual ones.

21      UNSUPPORTED ARGUMENT:  Because FFIC agreed to Friedman serving as a

22  court-appointed expert and because Friedman started work before he received a

23  conflict waiver, this "supports the inference that he [Friedman] and Fireman's Fund

24  already knew that his opinion were not going to be adverse to Fireman's Fund from the

25  start."[22]  Plaintiff supports this supposition by citing to Ex. X and Ex. A, p. 112:7-11, p.

---

[19] See for example, Doc. #62,  Ex. A, p. 59:23-60:3.  He never testified that FFIC was his client.
[20] Doc. #62, Ex. A, p. 54:8-55:7.
[21] Doc. #62, Ex. X.
[22] Doc. #62, p. 11: 9-25.

122:14-123:3, and Ex. R.  Unfortunately none of these documents do more than reveal that Friedman was aware that Bingham represented FFIC, that he revealed this to the Trustee and FFIC, and that he sought a waiver of the conflict.  This does not support the inference that the Plaintiff wishes the Court to draw.

Plaintiff also argues that FFIC shaped the testimony that Friedman would give through ex parte communications even before he was appointed by the Court.[23]  In support of its statement that there were such communications in November 2009, Plaintiff points the Court to Ex. A, p. 122:2-122:4, Ex. G, and Ex. H.  Ex. G and Ex. H. are both dated 12/11/09, which was the day after the hearing in which the Court suggested selecting a court-appointed expert and the date of the hearing at which Friedman was identified to the Court.  Ex. G is from Trustee's counsel, who indicates that Friedman had briefly discussed the scope of retention with Richard Towne (counsel for Dykstra's estranged wife, not for FFIC) and that he is informed that the FFIC counsel does not object to Friedman being retained in this case.  Ex. H is an email from Towne to Friedman, with copies to other counsel (including that of FFIC), gathering documents for Friedman to review.  The testimony in Ex. A only shows that there was contact before actual employment.  This does not support that contention that these "pre-retention communications show evidence of a set-up by Fireman's Fund and that Mr. Friedman could not be independent and was already favoring Fireman's Fund."[24]  The theory seems to be that because there was a search for an expert before the December 10, 2009 hearing at which the Court suggested that a court-appointed expert be selected, hiring Friedman was a set-up between FFIC and the Trustee.  In fact it was obvious to all parties that an expert on insurance coverage would be required and there

---

[23] Doc. #62, p. 11:26-12:5.
[24] Doc. #62, p. 12:7-9.

was no reason for the parties to wait before searching for one.

At the December 10, 2009 hearing, the Trustee suggested using one of the attorneys from his counsel's firm, which Dykstra flatly rejected.[25]  So on December 11, 2009 the Trustee (with the assistance of Towne) identified Friedman of the Bingham firm as the expert that they would like to have employed and that he would be able to do a report within the following two week period.[26]  Dykstra was not present at that portion of hearing because he chose to attend by phone; did not call Court Call, but called my chambers instead; and then later asserted that he could not afford to pay for Court Call. The Court requested that Court Call allow him to use their service without charge for that one hearing.[27]

Most of the December 11, 2009 hearing was dedicated to selecting a damages expert.  The Court set up a process by which all parties other than Dykstra could compile a single list of qualified people and Dykstra could then choose the expert from that list.  When Dykstra called in, the Court advised him of this and told him that a lawyer with expertise in the area of insurance coverage had been found.  Dykstra wanted to use the same selection process (the proponents of the settlement would provide names and he would select from the list), but the Court overruled this.  The Court stated that it was hard to find an insurance expert, but that the firm involved has no ties with anyone.[28]

As stated by the Court at the December 29, 2009 hearing, on December 10 the Court had suggested a court-appointed expert since the parties did not seem able to agree on anything.  But on December 29, 2012 the Court left it to the Trustee as to

---

[25] Hearing, 12/10/09, 2:06 p.m.
[26] Hearing, 12/11/09, 1:35-1:38 p.m.
[27] Hearing, 12/11/09, 1:37 p.m., 1:45 p.m.
[28] Hearing, 12/11/09, 2:09-2:11 p.m.

whether he wished to employ Friedman as his own expert or allow him to serve as the

court-appointed expert.  Because of the lack of money in the estate, the Trustee stated

that he preferred that Friedman be appointed by the Court with an order that allowed the

Trustee to pay him once assets were recovered or liquidated.[29]  At the time of the

employment, the Court and Dykstra were both aware that Friedman was acceptable to

the Trustee and to Ms. Dykstra.

There is no inference to be drawn from the fact that Friedman may have been

contacted prior to the December 10 hearing.

On p. 3:17-20 of its Supplemental Opposition, Plaintiff states: "Even before Mr.

Friedman was retained, Fireman's Fund had already approved and wanted Mr.

Friedman to be the expert in this case knowing he was a partner for the firm that

represented Fireman's Fund and would support the settlement for Fireman's Fund."  In

support of this statement, the brief refers to Exhibit A, p. 92:11-19.  This citation has

nothing to do with the contention for which it is cited.  Friedman merely testifies that he

would not have acted as an expert without Fireman's Fund waiver of the conflict of

interest because it would have exposed him and his firm to a claim.

A further unsupported statement occurs in footnote 1 to the Supplemental

Opposition when Plaintiff argues that Ex. DD shows "contrived legal strategies over

'personal' representation by Mr. Friedman."  Quite to the contrary, Ex. DD shows that

Friedman was very concerned about the accuracy of the declaration that was being

prepared for his signature.

---

[29] Hearing, 12/29/09, 9:07-9:09 a.m.

ISSUE:  Friedman gave testimony that was skewed in favor of FFIC and to the detriment of Dykstra.

PROFFERED EVIDENCE:  Friedman declared that there was no bad faith without reviewing the claims files, though he admits that these were important in determining bad faith.[30]  Friedman had no experience on first party residential property insurance matters, he has represented insurance companies in bad-faith cases, and Bingham generally does not represent policy-holders in bad faith insurance cases.[31]

UNSUPPORTED ARGUMENT:  Plaintiff contends that Friedman misstated the law on bad faith first party cases in favor of FFIC, but provides no evidence in support of this statement.

Plaintiff asserts that Friedman testified at his deposition that "as an institutional matter of policy, Bingham does not represent policyholders against insurers in bad faith cases."[32]  In fact Friedman responded to the question "[d]oes Bingham represent policyholders against insurers in bad-faith cases, to your knowledge?" with the statement, "Yeah.  That's probably a good question.  I think generally not."  He went on to testify that while insurers do not usually like to hear that their counsel are claiming that the insurer's conduct is unreasonable, "I have represented policyholders here at Bingham in connection with coverage issue.  I don't believe that I've actually filed any bad-faith lawsuits."[33]

---

[30] Doc. #62, Ex. A, p. 18:16-21, p. 19:7-10.  These statements only support that it is important to review the claims file if bad faith is the issue, but Friedman specifies that if the issue is scope of coverage, such a review is unnecessary.  He also states that he did review the documents that would have been in the claims file, though he did not review the claims file itself.  Ex. A, 83:6-13.
[31] Doc. #62, Ex. A, p. 16:21-17:25.
[32] Doc. #62, p. 12:17-18, citing to Ex. A, p. 17:20-25.
[33] Ex. A, p. 18:5-14.

ISSUE:  Friedman did not disclose that he and Richard Towne, attorney for Dykstra's estranged wife, were former law firm colleagues with a pre-existing relationship.

PROFERRED EVIDENCE:  The two of them practiced law together in the 1980s at Cotkin, Collins & Franscell.[34]  This is not in dispute.

ISSUE:  The Court should not have appointed Friedman since he had ties to FFIC and thus could not be truly independent.

Plaintiff points to a variety of opinions and argument to support the above statement.  However, this is not the issue before the Court as to this adversary proceeding. The hearing on the settlement motion has long since passed and the Court made its ruling.  The proper action if Dykstra felt that he was denied the proper process set forth in Fed. Rule of Evid. 706 or if he questioned the independence of Friedman was to appeal the decision of the Court.  He did not do so and that path is no longer available to him.

In re Kensington Int'l, Ltd., 368 F.3d 289 (3rd Cir. 2004), which Plaintiff now cites for the general proposition that court-appointed advisors should be neutral, actually deals with the relationship of the judge to the advisors, particularly in a situation in which the judge and advisors are having ex parte communications and meetings.[35]  This does not mirror the situation here, although the Plaintiff labels it as "a conflict far less egregious than the *concurrent* attorney-client relationship conflict admitted to by Friedman and Fireman's Fund, where the advisors were concurrently involved as

---

[34] Doc. #62, p. 12, fn 4.  Ex. A, p. 41:9-10.

[35] Counsel for Plaintiff should be aware that in citing a Court of Appeals decision, it is necessary to indicate the circuit as part of the citation.  This was not done on Kensington (p. 4, l. 15 of the Supplemental Opposition), but since the description states that this was a Third Circuit decision, the Court views this a an oversight rather than any attempt to mislead the Court.

1   advocates for similarly situated claimants in other asbestos cases."[36]

2       Plaintiff reargues the issues of <u>Flatt v. Superior Court</u>, 9 Cal.4[th] 275 (1994) as to

3   the duty of loyalty of an attorney to his/her client.  This was dealt with in the Court's

4   February 29, 2012 Memorandum.  Although Plaintiff argues that the Court erred in its

5   February 29, 2012 order as a matter of law, the issue of whether Friedman could legally

6   serve as a court-appointed expert witness will not be reanalyzed further.

7       The real issue here is not whether Dykstra had a right to appeal the Court's order

8   of March 18, 2010[37] (which he did not do) or to object to Friedman or even whether the

9   Court made an error in allowing Friedman to testify.  It is whether there is evidence that

10  FFIC acted so as to fraudulently conceal from Dykstra (or the Court) the relationship of

11  Friedman to FFIC.

12                              <u>FINDINGS OF FACT</u>

13      The Court has admissible evidence to establish the following facts:

14      1.  Friedman was an attorney at Bingham – there is no dispute that this was
    disclosed.

15      2.  Bingham had represented FFIC in the past – there is no dispute that this was
    disclosed.

16      3.  Friedman had never personally represented FFIC – there is no dispute that
    this was disclosed.

17      4.  In the past, on one case, Friedman had served as an attorney adverse to
    FFIC – there is no dispute that this was disclosed.

18      5.  At the hearing on 12/10/09 the Trustee offered to use an expert from his own

---

[36] Doc. 62, pp. 4:20-5:2.  This statement does not accurately reflect the depth of relationship between the judge and the advisors as described in <u>Kensington</u>.
[37] The Memorandum of Opinion and Order as to the settlement between FFIC and the Trustee are on case 1:09-bk-18409, doc. ##228 and 229.

firm, but Dykstra objected. [hearing, 12/10/09, 2:06 p.m.]

6. At the hearing on 12/11/09 Towne and the counsel for the Trustee suggested that Bruce Friedman of the Bingham firm could serve as an insurance coverage expert. At the end of the hearing, when Dykstra joined via Court Call, the Court overruled the objection of Dykstra to the process of selecting the insurance expert and advised Dykstra that an insurance expert would be hard to find.  The Court also erroneously and with no factual basis told Dykstra that Friedman's firm had no ties to anyone. [hearing, 12/11/09, 1:35-1:38 p.m., 2:11 p.m.]

7. At the time that the Court appointed Friedman, the Trustee's counsel stated in open court (with Dykstra being present) that minor conflicts existed, that Friedman's firm had represented FFIC from time to time, that Friedman had never represented FFIC and had been adverse to them several times.  [hearing, 12/29/09 – 9:06–9:10 a.m.]

8. At the time that the Court appointed Friedman, Dykstra made no objection to him, though he wanted to make sure that no expert from Trustee's counsel's firm would be appointed and he also wanted the damage report to be completed before the insurance expert testified.  [hearing, 12/29/09 – 9:06–9:10 a.m.]

9. At the time that the Court appointed Friedman, the Court stated that it would be hard to find an expert in this field who had not represented every insurance company at some time.  [hearing, 12/29/09 – 9:06–9:10 a.m.]

10. At the hearing on 12/29/09 the Court gave the Trustee the option of appointing Friedman and the damages expert as experts for the Trustee, but the Trustee stated that he preferred that they be appointed by the Court so that when the estate had money they could be paid under the employment order. [hearing, 12/29/09, 9:07–9:09 a.m.]

11. The Court appointed Friedman under Fed. Rule of Evid. 706. The Exhibit to the Order (the retention agreement) was on the Bingham letterhead. This was served on Dykstra on January 14, 2010. [Doc. #176][38]

12. Friedman's expert report was on the Bingham letterhead. This was served on Dykstra on February 16, 2010 and was used in the hearing on February 19, 2010. [Doc. #199, filed 2/16/10]

13. Friedman testified at length on February 19, 2010 and no one asked him any questions concerning his or his firm's relationship to FFIC. Dykstra cross-examined Friedman for one hour during that hearing. [hearing, 2/19/10 – cross-examination from 11:18 a.m. to 12:18 p.m.]

14. Terry Houlihan, another Bingham partner located in Bingham's San Francisco office, was concurrently representing FFIC in a separate matter not involving Dykstra.

15. An actual conflict of interest existed and Friedman received a conflict check report that probably noted it.

16. Friedman probably knew that there was an FFIC active case in the office at the time that he testified.

17. There is no evidence that Friedman ever advised Towne, FFIC or the Trustee (or their counsel) of the actual conflict check.

18. Friedman acted as though there were an actual conflict and obtained a waiver from FFIC and from the Trustee. [Doc. #62, Ex. A.]

---

[38] Doc. #176 is the Exhibit to the Order to appoint Friedman and Thomas (the damages expert), but the Order itself is Doc. #186.

19. Bingham opened this as a firm file and the conflict letter was not just for Friedman, but was actually a waiver of conflict as to the Bingham firm. [Doc. #62, Ex. K. Ex. A, p. 57:4-8].

20. At all relevant times, Friedman was an equity partner in Bingham. [Doc. #62, Ex. A, p. 10:19-23].

21. Dykstra was never given a conflict of interest waiver.

22. On January 7, 2011, in response to Dykstra's email demands for immediate payment of additional ALE (alternative living expenses), counsel for FFIC wrote Dykstra that the "Court has also appointed independent third parties as experts to review the remaining issues in the pending claims on Newbern Court." He advised Dykstra to "address any further concerns relating to these matters [policy benefits] to the Bankruptcy Trustee as appropriate." [Doc. #62, Ex. X].

23. The Trustee only advised Dykstra of "potential" conflicts, not actual ones.

24. Friedman admits that it is important to review the claims files in determining bad faith, did not review the claims file, but testified that there was no bad faith. [Doc. #62, Ex. A, p. 18:16-21, p. 19:7-10].

25. Friedman had no experience on first party residential property insurance matters, he has represented insurance companies in bad-faith cases, and Bingham generally does not represent policy-holders in bad faith insurance cases. [Doc. #62, Ex. A, p. 16:21-17:25].

26. Friedman reviewed a variety of documents, which he believes are all or substantially all of what was in the claims file. [Doc. #62, Ex. A, p. 83:6-13]

27. Friedman and Richard Towne (the attorney for Dykstra's estranged wife, who supported the settlement), had practiced law together in the 1980s at Cotkin,

Collins & Franscell.  This was not revealed to Dykstra or the Court.  [Ex. A, p. 41:9-10].

28.  Bingham generally does not represent policy-holders in bad faith insurance cases.  However, Friedman as done so several times.

29.  FFIC was sent the conflict waiver and waived the conflict.

30.  There were communications between Friedman and Towne (and then with counsel for the Trustee) prior to the hearing on December 10, 2009 at which the Court suggested a court-appointed expert.  [Doc. #62, Ex. A, p. 122:2-122:4].

Further, the Court takes judicial notice of the content of the Bingham website concerning Bruce Friedman, a copy of which is attached hereto.[39]

That is the sum total of the admissible evidence before the Court.  The above items are largely or completely without dispute although the parties may interpret them differently.  As to any disputes on these facts, no party has provided any admissible evidence to the contrary.  The rest of the Plaintiff's assertions are not support by admissible evidence.  Many of them are unreasonable assumptions with nothing on which to base them.

## DISCUSSION AND CONCLUSIONS OF LAW

Summary judgment is proper when the pleading, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Material facts are those which may affect the outcome of the proceedings. Anderson v. Liberty, Inc., 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of identifying those

---

[39] This was downloaded on June 5, 2012 and may not be in the exact form as existed in 2010.  However, it is certain that the website in 2010 identified Friedman as a partner in the firm.  Fed. Rule of Evid. 201 allows the Court to take judicial notice, whether requested or not, of facts not subject to reasonable dispute.  The Court does not take judicial notice that everything written on this website is true, only that it was available for review by the public.

portions of the pleadings, discovery, and affidavits that demonstrate the absence of a

genuine issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On

an issue for which the opposing party will have the burden of proof at trial, the moving

party need only point out "that there is an absence of evidence to support the

nonmoving party's case." Id. at 325.  The facts must be viewed in the light most

favorable to the party opposing the motion. Anderson, 477 at 249; Masson v. New

Yorker Magazine, 501 U.S. 496, 520 (1991).

Once the moving party meets its initial burden, the nonmoving party must go

beyond the pleading and, by its own affidavits or discovery, "set forth specific facts

showing that there is a genuine issue for trial." FRCP 56(e). At the summary judgment

stage, the judge's function is not himself to weigh the evidence and determine the truth

of the matter but to determine whether there is a genuine issue for trial. FRCP 56(c).

There is no issue for trial unless there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party; if the evidence is merely colorable or is

not significantly probative, summary judgment may be granted. FRCP 56(c). Mere

allegations or denials do not defeat a moving party's allegations. Id.; see also Gasaway

v. Northwestern Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).

However, the court is not limited to granting or denying the motion(s) before it.

Pursuant to Rule 56(f), after giving notice and a reasonable time to respond, the court

can grant judgment to the non-moving party, grant judgment on grounds not raised by a

party, or even consider granting judgment on its own motion once it identifies the issues

for the parties.

Fraudulent concealment is a creature of state law.  The elements are set forth in

Calif. Civil Jury Instructions (CACI) 1-1900 CACI 1901, which is based on Cal. Civ.

Code §1710:.

[ *Name of plaintiff* ] claims that [he/she] was harmed because [ *name of defendant* ] concealed certain information. To establish this claim, [ *name of plaintiff* ] must prove all of the following:

[1. (a) That [ *name of defendant* ] and [ *name of plaintiff* ] were [ *insert type of fiduciary relationship, e.g., "business partners"* ]; and

(b) That [ *name of defendant* ] intentionally failed to disclose an important fact to [ *name of plaintiff* ];]

*[or]*

[1. That [ *name of defendant* ] disclosed some facts to [ *name of plaintiff* ] but intentionally failed to disclose [other/another] important fact(s), making the disclosure deceptive;]

*[or]*

[1. That [ *name of defendant* ] intentionally failed to disclose an important fact that was known only to [him/her/it] and that [ *name of plaintiff* ] could not have discovered;]

*[or]*

[1. That [ *name of defendant* ] actively concealed an important fact from [ *name of plaintiff* ] or prevented [him/her/it] from discovering that fact;]

2. That [ *name of plaintiff* ] did not know of the concealed fact;

3. That [ *name of defendant* ] intended to deceive [ *name of plaintiff* ] by concealing the fact;

4. That [ *name of plaintiff* ] reasonably relied on [ *name of defendant* ]'s deception;

5. That [ *name of plaintiff* ] was harmed; and

6. That [ *name of defendant* ]'s concealment was a substantial factor in causing [ *name of plaintiff* ]'s harm. [40]

The first question that the Court must determine is whether there is sufficient

evidence to create a triable issue of fact as to the initial elements of a fraudulent

concealment claim: that FFIC concealed a fact(s), that the concealed fact(s) is

---

[40] Calif. Civil Jury Instructions 1901.  As noted above, failure to disclose to the Court would be actionable unless Dykstra had independent knowledge of the fact(s) that were not disclosed or should have known them.

1    important, and that Dykstra did not know of the concealed fact(s).

2        To apply the law, the Court needs to first determine the content of the "false"

3    statement(s) or the nature of the alleged omission.  Except as noted on Findings of Fact

4    #21 (counsel for FFIC wrote to Dykstra that the Court was appointing "independent third

5    party experts"), FFIC made no representations to Dykstra or the Court.  It did not offer

6    Friedman as a witness.  It merely did not object to his appointment.  It did not prepare

7    any of the documents that were presented to the Court, although it did sign the conflict

8    waiver.  As to this, while it was technically true because Friedman's firm was

9    representing FFIC in another unrelated case, from the colloquy in court, it was clear that

10   Friedman's firm had represented FFIC and that part of their practice was representing

11   insurance companies.

12       There was no doubt that Friedman was a lawyer in the Bingham firm and that this

13   was a firm which had a specialty in insurance defense.[41]  Friedman's background and

14   the fact that he was a partner in the firm (and thus an equity-sharer) were easily

15   accessible facts from the Bingham website.  Had anyone sought more information about

16   Friedman through the website, that person would have found that Friedman specialized

17   in insurance law and insurance litigation and had acted as counsel to insurance

18   companies in the area of insurance coverage.  It was this exact knowledge that made

19   him an expert and thus he was qualified to testify.  It was also revealed the FFIC was or

20   had been a client of Bingham and there was no reason to believe that Bingham would

21   not be seeking future business from FFIC.

22       The Court had even stated that it was likely that any insurance defense firm

23

24

25

26

27

28

---

[41] Although the Court initially stated that Friedman's firm had no ties to anyone [hearing, 12/11/09, 2:11 p.m.], this was an erroneous statement and was clarified at the next hearing when Trustee's Counsel told the Court in Dykstra's presence that Friedman's firm had represented FFIC from time to time and that minor conflicts exist. [hearing, 12/29/09, 9:06-9:10]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

would represent all of the large insurance companies and that it would be difficult to find

a truly independent witness.  Dykstra did not request that the parties or the court search

farther.  And although he cross-examined Friedman for an hour after Friedman's written

report and initial testimony, Dykstra did not ask about Friedman's relationship to FFIC.

Another fact that was not specifically disclosed is that Bingham was

simultaneously representing FFIC in an unrelated case.  While this could not be

ascertained through the website, it was obvious that Friedman acted as if FFIC were a

present client.  As noted above, the issue of Friedman's ethics in testifying is not

relevant to this motion.  Although Dykstra did not delve into it, the Court was clear that it

understood that Friedman's firm had an ongoing relationship with FFIC and other

insurance companies and that this would not be grounds to disqualify him as a court-

appointed expert.  If the Court was wrong, that should have been dealt with on appeal.

It cannot be laid at the feet of FFIC.

As noted, the alleged undisclosed facts about Friedman's relationship to

Bingham and the type of work that he and the firm did were public and easily

ascertainable by Dykstra and the Court.  There was no attempt by FFIC to hide

Friedman's status within Bingham or that it had another case pending at the Bingham

firm.  In fact the existence of the conflict waiver would lead anyone to think that FFIC

and Bingham had a present relationship.

Perhaps if Dykstra had been represented by counsel, that attorney would have

delved deeper and could have assisted in finding an expert either for the Court or on

behalf of Dykstra.  Although a party representing himself is not always held to the same

standard as one represented by counsel, the Court was satisfied with the information

given as to Friedman's relationship with FFIC and will not now act as through Dykstra

had asked probing questions.

Dykstra's decision to act in pro se was solely voluntary.[42]  Dykstra cannot now seek to blame FFIC for his own choices and shortcomings.

Then there is the issue of whether the missing facts were "important."  While the cases tend to use the term "material," under California interpretation that is synonymous with "important."  Important is defined as "marked by or indicative of significant worth or consequence: valuable in content or relationship."[43]  Significant indicates something that has influence.[44]

Was it important to know that Friedman was an equity holder rather than a wage-earner (ie. associate or of counsel ) with Bingham?  The argument of Plaintiff is that as an equity holder Friedman would stand to share in future profits and this would tend to influence his testimony in favor of FFIC.  First of all, this is not a fact that was hidden by FFIC, as discussed above.  But beyond that, every employee of a law firm shares in future profits to some extent, be it through keeping ones' job, being awarded a bonus, or receiving periodic salary increases.  There is no reason to think that an equity-holder (partner) would have a greater reason to make a client happy than would a non-equity attorney.  In fact, there is every reason to believe that a partner would be more sure about his future with the firm than an associate, who could be fired or have partnership deferred if s/he acted so as to lose a major client for the firm.  Thus the court finds that the failure to disclose that Friedman was a partner is both not a hidden fact and also not an important one.

---

[42]  The Court has had an opportunity to deal with Dykstra in many areas during his bankruptcy case.  The Court has previously found him to completely lack credibility.  Although at the hearing on the settlement he claimed that he could not afford counsel, he was living a luxurious lifestyle.  He has had several attorneys at various times and at others he has chosen to represent himself.

[43]  http://www.merriam-webster.com/dictionary/important, accessed 6/7/12.

[44]  http://www.merriam-webster.com/dictionary/significant, accessed 6/7/12.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The fact that Towne and Friedman had been partners in the same law firm some twenty or thirty years earlier is totally irrelevant and cannot be attributed to any wrongdoing by FFIC, even if FFIC knew of this (and there is no evidence that FFIC did). There is no need to explore this further since this is simply not an important or even relevant fact to Friedman's selection and testimony.

The level of Friedman's preparation (whether he reviewed the claims file) and his experience (that he did not deal with residential claims) should have been the subject of cross-examination and were not required to be disclosed at the time of the appointment. There is also evidence that Friedman reviewed all of the documents which were necessary to his report, which dealt with the scope of coverage and only touched on the bad faith issue.[45]

This table describes each fact that was not revealed and whether the Court finds that it meets the requirement of being concealed (and if so by whom) and important. (The table uses the abbreviation "FF" to refer to a Finding of Fact set forth above.)

---

[45] As stated in the Memorandum of Opinion (Doc #59), the Court did its own review of the policy as well as heard the testimony of the damages expert and of Friedman and then decided the scope of coverage and the probable liability of FFIC. Further, the Order of Appointment specifies that Friedman was to "present an opinion as to the scope of the policy and the coverage of claims being asserted against the policy." The issue of bad faith is not mentioned.

| Omitted or Misstated Fact (from above Findings) | True Situation | Is it Important and Why | Was it Concealed and By Whom |
|---|---|---|---|
| Trustee's counsel represented that minor conflicts existed and also that there were "potential conflicts"  [FF 7, 23] | Because of the unrelated case in the Bingham San Francisco office, there was an actual conflict | Not important.  There is no relevance to whether there was a current case in the office since it was clear that Bingham had represented FFIC in the past and would likely represent them in the future.  It also was never represented that Bingham did not represent FFIC at that present time. | The Court made it clear that any expert in this field was likely to be in a firm that represents insurance companies. [FF 9] |
| Trustee's counsel represented that Friedman's firm had represented FFIC from time to time [FF7] | This is a true statement.  The only issue is that he did not state the current representation in the SF case. | Not important.  See comment above. | The only alleged concealment was the current representation in the SF case, which is discussed above. |
| Trustee's counsel represented that Friedman had been adverse to FFIC several times [FF7] | This may be true, but in his deposition Friedman only noted a single instance when he was adverse to FFIC | Not important.  The statement was made to show that Friedman had opposed FFIC in the past and whether it was once or several times is not significant | There is no evidence that anyone tried to conceal this. |

| Omitted or Misstated Fact (from above Findings) | True Situation | Is it Important and Why | Was it Concealed and By Whom |
|---|---|---|---|
| Bingham opened this as a firm file.  [FF 19] | | Not important.  It was clear that Friedman was an attorney at Bingham and there was no representation that he was working independent of that position | This was not concealed.  The conflict letter, which was presented to the Court, showed that FFIC was waiving the conflict with Bingham and not with Friedman as an individual. [FF 19]  The retention agreement, which was served on Dykstra on 1/14/10, was on Bingham letterhead. [FF 11]  Also Friedman's written report was on Bingham letterhead. [FF 12] |
| Friedman is an equity partner at Bingham. [FF 20] | | Possibly important, but probably not.  It is true that an equity partner shares in the profits (and losses) of his firm, but even an associate sees his compensation affected by firm profits and is vulnerable for his job based on the ongoing success of the firm as well as the quality and quantity of his work. | It was not concealed.  No representation of status was made.  Also this is publicly available information from the Bingham Website (see attached). |
| Friedman did not seek a conflict waiver from Dykstra | | No important.  There is no requirement that an attorney seeks a conflict waiver from a party who he has not represented. | |

| Omitted or Misstated Fact (from above Findings) | True Situation | Is it Important and Why | Was it Concealed and By Whom |
|---|---|---|---|
| Counsel for FFIC wrote Dykstra that the "Court has also appointed independent third parties as experts to review the remaining issues in the pending claims on Newbern Court."  [FF 22] | Friedman was appointed by the court as a court appointed expert and thus is presumed to be independent, but his firm had and did represent FFIC | Not important.  Although there was some confusion as to whether Friedman would testify for the Trustee or as a court-appointed expert, this was all discussed in Dykstra's presence. | This was not a misstatement by FFIC since Friedman and the construction experts were indeed third parties and not employees of or affiliates with FFIC.  They were not under the supervision of FFIC.  Given the context of the letter, which was in response to Dykstra's continued demands for and threats about the ALE payment, the Court cannot find that the failure to state that Bingham had or was representing FFIC was an act of concealment.  At the time of this letter (January 7, 2010), Dykstra was already aware that Friedman's firm had represented FFIC in the past and it was inferred that they would likely continue to seek business from FFIC. |

| Omitted or Misstated Fact (from above Findings) | True Situation | Is it Important and Why | Was it Concealed and By Whom |
|---|---|---|---|
| The trustee advised Dykstra only of "potential" conflicts, but did not state that there was an actual conflict. [FF 23] | There was an actual conflict due to the SF case at the Bingham firm [FF 14] | Not important.  The SF case was totally unrelated to the Dykstra case.  The Court was aware that Bingham had and probably would continue to represent FFIC. | This was concealed to the extent that it was known.  Friedman received a conflicts check report that almost certainly noted the other case and he probably was aware of it at the time that he testified.  [FF 15, 16, 17, 18]  However if appears that he was not in court when this representation was made. Also, the representation was made by the Trustee, not be FFIC.  And there is no evidence that Bingham ever advised Towne or the Trustee (or his counsel) of the existence of this other case. |
| Friedman did not review the claims file. [FF 24] | | Not important.  Friedman saw the relevant documents for his testimony on the scope of coverage.  Due to the findings in that regard, there was no claim for bad faith and Friedman testified that you only need to review the claims file in bad faith cases. [FF 26] | This was not concealed.  It was never asked and was not relevant. |
| Friedman did not have first party residential property insurance experience. [FF 25] | | | This was not concealed.  No one asked him about his specific experience in this area. |

| Omitted or Misstated Fact (from above Findings) | True Situation | Is it Important and Why | Was it Concealed and By Whom |
|---|---|---|---|
| Bingham generally does not represent policy-holders in bad faith insurance cases. [FF 28] | | Not important. Friedman has represented policy-holders. Bingham allowed him to testify. FFIC waived any conflict. | This was not concealed. No questions were asked in this area. |
| Friedman and Towne were partners in the same law firm in the 1980s. [FF 27] | | Not important. There is no ongoing relationship. Also Towne represented Dykstra's estranged spouse, not FFIC. | This was not concealed as there was no reason to point it out. |
| There were communications between Friedman and Towne and then with counsel for the Trustee prior to the 12/10 hearing. [FF 30] | | Not important. Everyone knew that an expert would be needed and it was expected that the parties would start trying to locate one even before the 12/10/11 hearing. | This was not concealed. Friedman did not suddenly appear out of thin air. It is clear that there were prior contacts with him. |

The reality of this situation is that Dykstra, who has had a variety of attorneys over the three years of this case, chose to represent himself.  He stated at the hearing that he had been living on the street and had no assets.  He even asked that the Court Call fee (ca. $45 per hour) be waived for the December 11, 2009 hearing.  However during hearings on other matters in the Dykstra bankruptcy, the Court found that he managed to continue to live a luxurious lifestyle and to find money to support that lifestyle.  Dykstra certainly had the opportunity to present his own expert.  However at the time that the Court was dealing with this settlement motion, it was impossible for Dykstra to work cooperatively with opposing counsel.  That is why the Court sought a court-appointed expert and kept Dykstra out of the initial selection process.  But the use of a court-appointed expert does not preclude each party from hiring its own expert to testify.

The question raised by this motion for summary judgment is whether FFIC acted so as to defraud Dykstra or the Court.  There is no admissible evidence to support this.  Grant summary judgment to FFIC as to the second claim for relief (fraudulent concealment) and as to the third claim for relief (intentional infliction of emotional distress).

###

DATED: June 12, 2012

United States Bankruptcy Judge

1

## EXERPT FROM MEMORANDUM OF OPINION (DOC. 59. P. 5-11)

2

Claim Two

3
        In its 6/9/11 memorandum the court stated that this claim alleging fraudulent
concealment must plead that (a) Friedman had personally represented FFIC before
3/5/10, (b) the insurers or their counsel knew this fact and intentionally concealed it, (c)
plaintiff would have acted differently had he known this and (d) plaintiff suffered
damages as a result of the concealment.

4

5
        FAC ¶ 30 alleges that "as a partner of the Bingham McCutcheon firm, Friedman
and his firm personally represented FFIC Defendants as their clients on or before March
5, 2010." Although plaintiff uses the word "personally," he does not use it as to
Friedman alone but as to him and his firm. In his declaration presented in support of the
motion to dismiss, Friedman states that "I personally have never represented Fireman's
Fund or any related entities or subsidiaries. To the contrary, I have been adverse to
Fireman's Fund in the past." As indicated in the court's 1/24/12 tentative ruling, the court
intended to allow Friedman's declaration to come in and treat the motion to dismiss as
one for summary adjudication on this issue.

6

7

8

9

10
        However, plaintiff's counsel strongly objected to not having had an opportunity to
present evidence contradicting Friedman's declaration. Plaintiff's counsel argued that
the 12/15/09 waiver of potential conflict letter by Friedman (Exh.6 of the FAC) states
that a conflict exists and refers to "our work" and "our representation" of FFI and
therefore creates a genuine issue of material fact as to whether Friedman personally
represented FFI. Friedman addresses this very point in his declaration, explaining that
when using the word "our" he was referring to the firm's representation, not his personal
representation of FFI, and he again declares that he never personally represented FFI.
Plaintiff has not raised any doubt about the credibility of Friedman's declaration nor
presented any evidence to the contrary, but instead requests more time to conduct
discovery. To the extent that a motion to dismiss is treated as one for summary
adjudication, Fed. Rule of Civ. Proc. 12(d) requires that the court provide all parties with
a reasonable opportunity to present all material relevant to the motion. As such, plaintiff
will be allowed a short continuance to conduct discovery on the issue of Friedman's
personal representation of FFI.

11

12

13

14

15

16

17

18
        Plaintiff takes his argument further by stating that FFI was Friedman's client
because Friedman is a partner at Bingham. Thus, since Friedman admitted an actual
conflict due to concurrent representation of FFI by Bingham, he should not and could
not have been appointed to be the court's independent expert because ethically he
cannot testify against his own client (FFI). Further, FFI had a duty to disclose the conflict
to plaintiff; instead, only the trustee's attorney made representations to the court
regarding the existence of "minor conflicts" in connection with the experts. Plaintiff
argues that this was "grossly insufficient" and had Friedman's actual conflict been
properly disclosed, it would have been clear to the court that under applicable law this
type of conflict is not subject to being waived and Friedman would automatically be
disqualified from being a neutral court expert. Citing to the California Supreme Court
case of Flatt v. Superior Court, 9 Cal.4th 275, 284-86 (1994)(discussing California law
on successive and simultaneous conflicts), the district court case of Certain
Underwriters at Lloyd's London v. Argonaut Ins. Co., 264 F.Supp.2d 914, 919 (N.D. Cal.
2003)(applying the prohibition against concurrent representation of adverse parties),
Cal. Rule of Prof. Conduct 3-310(C)(3)(prohibiting adverse representation in separate
matters absent informed written consent of each client) and ABA Model Rules of Prof.
Conduct 1.7 (providing standard which must be followed to allow concurrent
representation of adverse clients) and 1.10 (imputing disqualification to other lawyers in
same firm, absent written waiver of affected client), plaintiff argues that simultaneous
representation of adverse clients is not allowed, even where the adversity arises in two
unrelated matters. This results in "per se" or "automatic" disqualification.

19

20

21

22

23

24

25

26

27

28

The question is whether plaintiff is correct as a matter of law. Plaintiff heavily relies on Rule 3-310 and the California Supreme Court case of <u>Flatt</u> for the proposition that an attorney is prohibited from simultaneous adverse representation. However, plaintiff is not correctly interpreting Rule 3-310 as requiring informed written consent from plaintiff. Plaintiff is not and has never been Bingham's client and thus this rule is inapplicable (written consent was obtained from Bingham's client FFI). Similarly, although <u>Flatt</u> is controlling California law in adverse representation cases, the case does not deal with the standard applicable to experts and is not analogous on the facts. In <u>Flatt</u> an attorney who consulted with a potential client declined representation because the law firm the attorney worked at already represented the party that the potential client was seeking to sue. Similarly, the <u>Argonaut</u> district court case applying California law is not analogous because it concerns concurrent representation of adverse parties by the same attorney.

This case is different in that the court appointed an expert pursuant to Fed. R. Evid. 706, which allows appointment on the court's own motion or on the motion of any party. Under Rule 706, the parties may agree upon an expert or the court may select one on its own. In this case, the court expressed the need for an insurance expert to opine on the scope of the insurance coverage and the validity of any bad faith claims against the insurers raised by plaintiff (see the last page of the court's written tentative ruling for the 12/10/09 hearing, filed on the main case docket on 12/10/09). At this time, Mr. Dykstra was not represented by counsel, however, he was present and represented himself during an evidentiary hearing that took place on 12/10/09. He also appeared by phone on 12/11/09 when the court decided that the chapter 7 trustee and Mr. Towne (Mrs. Dykstra's counsel) would choose the insurance expert (12/11/09 hearing transcript @ 2:12 p.m.). The record shows that Mr. Dykstra raised an objection and wanted to participate in the selection of the expert, however, the court overruled his objection and stated that his request could not be accommodated for practical reasons. Mr. Dykstra was assured that the chosen expert would not be a member of Mr. Towne's or the trustee's law firm (12/11/09 transcript at 2:14 p.m.).

At the 12/29/09 hearing (during which Mr. Dykstra was present in the courtroom), the parties informed the court that they had agreed on the insurance expert and identified Friedman (12/29/09 transcript @ 9:08 a.m.). Mr. Dykstra did not object to Friedman's engagement. Although he was not represented by counsel, he actively participated in the hearing and raised a question about the timing of Friedman's evaluation (12/29/09 hearing transcript @ 9:06 a.m.). The trustee's counsel mentioned that conflicts exist, and stated that full disclosure was made to all parties and nobody objected (12/29/09 hearing transcript @ 9:10 a.m.). The court approved Friedman as an expert pursuant to the order entered on 2/2/10, to which no objections were filed (the order was served on Mr. Dykstra and Mr. Dykstra c/o Dorothy Van Kalsbeek).

As the Advisory Committee Notes to Rule 706 point out, "[t]he inherent power of a trial judge to appoint an expert of [her] own choosing is virtually unquestioned." Fed.R.Evid. 706 advisory committee's note. Under Ninth Circuit law, courts "enjoy wide latitude to make Rule 706 expert appointments." <u>Monolithic Power Systems, Inc. v. O2 Micro Intern. Ltd.</u>, 558 F.3d 1341, 1348 (9th Cir.2009). As discussed in the case of <u>North Pacifica, LLC v City of Pacifica, et. al.</u>, 335 F.Supp.2d 1045, 1049-50 (N.D. Cal. 2004), the question of disqualifying an expert turns on whether he or she had access to confidential information about the other side. In <u>Pacifica</u>, on two different occasions two attorneys at the Bingham firm represented that plaintiff or plaintiff's agent in performing "a fair amount of substantive work" on a development permit. Both files had been closed by the time litigation between plaintiff and defendant commenced. Nevertheless, the court disqualified both attorneys from testifying as experts for defendants regarding the same development project, finding a "substantial likelihood that these experts obtained confidential client information." As a comparison, <u>Pacifica</u> mentions <u>Commonwealth Ins. Co. v. Stone Container Corp.</u>, 178 F.Supp.2d 938, 946-49 (N.D. Ill. 2001), where

the court concluded that an "attorney who previously worked for defendant should not be disqualified as expert for plaintiff, in part because attorney's prior representation of defendant involved activities 'far afield' from matters involved in the litigation at hand." Pacifica at 1050.

    Pacifica is instructive in making the distinction between the role of an attorney and the role of an expert, and why per se disqualification rules cited by plaintiff do not apply to Friedman. "There is a substantial difference between the role played by experts and counsel....'[w]hen a lawyer is engaged as a testifying expert, that lawyer is not being asked to perform the traditional role of a lawyer in providing legal advice.'" Pacifica at 1050, citing Commonwealth at 944-45. The expert's role is limited and experts do not share the same duty of loyalty as a lawyer would to his client. Id. Thus, rather than applying per se disqualification, "the courts have employed a fact-specific test where experts are involved." Id. at 1051. In addition, neither Pacifica nor any of the authorities cited by plaintiff support his argument that written informed consent was needed from Mr. Dykstra for Friedman to become the court's expert.

    Another argument raised by plaintiff is that court-appointed experts must meet a significant standard of disclosure and that FFI had an affirmative duty to disclose the conflict to plaintiff. In support of this argument, plaintiff cites Edgar v. K.L., 93 F.3d 256 (7th Cir. 1996), a case where defendants brought a motion to disqualify the presiding judge due to his ex parte communications with a court-appointed panel of three experts. Although both sides had consented to the panel's appointment, it was later discovered that the experts were not neutral but instead had been "influenced by secret submissions from advocacy groups and counsel supporting plaintiffs in other litigation against [defendant]." 93 F.3d at 261. It was also discovered that one of the experts wrote an ex parte letter to the judge advocating a certain position. Further, the court in Edgar not only accepted the panel's methodology but also announced that the panel's conclusions were incontestable. In short, although Edgar does contain one sentence stating that "[e]xperts appointed and supervised by a court carry special weight because of their presumed neutrality," it does not deal with the duty to disclose or the standard for disclosure that is binding on experts. Instead, its holding is limited to inappropriate and biased conduct by the court.

    In this case, the trustee's counsel and Mr. Towne were initially charged with choosing the expert; although at the 12/11/09 hearing plaintiff objected to not being allowed to participate in the selection (and wanting to ensure that the expert would not be from the trustee's or Mr. Towne's law firms), the court overruled that objection and encouraged the parties to cooperate in the selection process (see 6/9/11 memorandum of opinion, p.2). At the hearing on 12/29/09 the parties represented their agreement to having Friedman serve as an expert and plaintiff raised no further objections (see 6/9/11 memorandum of opinion, p.3). The trustee's counsel timely brought the issue of Friedman's conflict before the court and adequate disclosures were made (see 6/9/11 memorandum of opinion, p.3). Ultimately, the court felt Friedman was qualified to serve as an expert under Fed. R. Evid. 706 to "review the insurance policy and present an opinion as to the scope of the policy and the coverage of claims being asserted against said policy."

    Pursuant to order entered on 2/2/10, Friedman served as a court-appointed expert (to be paid by the estate as an administrative claimant). Friedman testified during an evidentiary hearing and all parties had the opportunity to examine him and ask questions. As the 3/18/10 memorandum, p.8, l.24, clearly states, "[t]he court conducted its own analysis of the Newbern insurance policy" and made its findings based upon that analysis. As other statements in the 3/18/10 memorandum make clear (see p.14), the court did not simply adopt Friedman's conclusions; it performed its own evaluation and reached its own findings. In sum, this case is not analogous to Edgar in any respect and neither Friedman nor Bingham (which represents FFI in non-related litigation) would be subject to disqualification under the test articulated in Pacifica, assuming plaintiff's

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

discovery confirms that Friedman has not personally represented FFI.

FFI also argues that the court did not grant plaintiff leave to amend Claim Two with respect to other individuals, yet ¶ 14 of the FAC alleges that defendants "withheld material information about the engagement of third parties, including Brian DuBois, William Thomas and Rick Towne, Esq., to act as agents of Defendants to conceal material facts and information from Plaintiff and/or to further the interest of Defendants over those of their insureds, including Plaintiff and Mrs. Dykstra." To the extent that plaintiff is attempting to plead fraudulent concealment, FFI objects to these statements as irrelevant and argues that they should be dismissed as lacking the required specificity to satisfy Rule 9(b). Since these allegations are not related to any specific cause of action in the body of the FAC and the individuals are not named as defendants, the purpose behind these statements is unclear. Moreover, if plaintiff is seeking to allege fraudulent concealment as to these individuals, he must satisfy Rule 9(b) which has not been done. See Vess, 317 F.3d at 1106. In short, these allegations about third party individuals fail for purposes of Claim Two.

1

BINGHAM WEB PAGE EXERPT

2

**Bruce A. Friedman**
3
**Partner**

4
Bruce Friedman has more than 35 years of complex litigation experience in the
5   insurance, financial services and products, and class action areas. He has been lead
trial counsel in dozens of jury trials, bench trials and arbitrations. He routinely
6   represents clients in high-stakes litigation.

7   Noted as a "*great strategist*" in *Chambers USA*, Bruce has a broad commercial litigation
practice with a large insurance component. Clients noted that he "is greatly respected
8   by peers on either side, being described by one as '*professional and cordial*,' while
another commented: '*I would certainly pick up the phone and call him as required.*' He is
9   '*very capable*' and '*commands the respect of juries and judges alike.*'"

10  Bruce also serves as a mediator and arbitrator, please click here for more
information on his ADR experience.
11

12  •      Represented AIG with respect to coverage advice on television writers' class
13  action age discrimination cases against the motion picture studios and television
networks
14
•      Counseled BDO Seidman in a class action involving real estate loan investment
15  vehicles

16  •      Served as counsel to the California Commissioner of Insurance in the insolvency
of Executive Life Insurance Company
17
•      Represented Comerica Bank in lending fraud lawsuit in which plaintiffs sought $9
18  million in damages; successfully persuaded plaintiffs to withdraw and settle prior to
jury verdict
19
•      Acted as counsel for Employers Reinsurance Company (acquired by Swiss Re)
20  in coverage litigation arising out of MP3 illegal downloading of music

21  •      Advocated for Employers Reinsurance Company in coverage litigation against
Disney/ABC arising out of a copyright class action against Disney/ABC for
22  unauthorized use of music on daytime television shows

23  •      Represented the Dannon Company in the defense of consumer class actions,
FTC and attorney general investigations alleging false advertising with respect to
24  Dannon's probiotic products Activia and DanActive

25  •      Counseled Aames Home Mortgage in class action litigation under the Fair Credit
Reporting Act
26
•      Served as co-lead counsel for Groupe Danone in a multijurisdictional suit against
27  certain parties affiliated with its Chinese joint-venture partner, relating to misuse of
Danone proprietary information and other commercial wrongdoing
28

- Counseled Mission Insurance Company in reinsurance and director and officer litigation arising out of Mission's insolvency

- Represented New Century Mortgage in class action litigation under the Fair Credit Reporting Act

- Represented Prudential Insurance Company officers in a class action arising out of "vanishing" premium life insurance policies

- Advised Realogy Corporation, fka Cendant Corporation and Coldwell Banker, in consumer class actions filed under RESPA

- Advised Titan L-3 in a class action securities litigation

- Guided Westfield Corporation in a class action arising out of taking its U.S. subsidiary private

- Speaker, *Attorney Client/Work Product Privilege for Communications Between Independent Defense Counsel and Insurers* (Dec. 13, 2011)

- Presenter, *Webinar: Best Practices — New Developments in Contract Litigation* (May 19, 2010)

- Speaker, *Lessons Learned in the Multi-Party, Multi-Policy, Multi-Insured and Multi-Lawsuit Context* (May 16, 2010)

- Panelist, *Ethics: Lawyering Over the Top*, University of Southern California Institute on Entertainment Law and Business (Oct. 17, 2007)

- Editor, "California Insurance Law," *Westlaw*

- Co-author, "Insurance Coverage for Patent Litigation," *Patent Litigation* (PLI Press, 2001)

- "Insurance Coverage for Trademark and Trade Dress Infringement," *ABTL Report,* Vol. XIX, No. 2 (February 1997)

- "Dismissal," *Civil Procedure Before Trial,* Continuing Education of the Bar (1990)

- Board of governors and past president, Association of Business Trial Lawyers

- American Bar Association Litigation Section and TIPS Section; Committees on Insurance Coverage, Professional Liability, Directors and Officers Liability, and Fidelity and Surety Law

**Community Service**

- Board of Directors, Public Counsel

- Former president, Board of Trustees, Wilshire Boulevard Temple (2004–2006)

- Former president and member of the board, Hope-Net, an interfaith homeless and hunger charity

- *Best Lawyers*, Insurance Law Lawyer of the Year (Los Angeles) (2012)

- *Chambers USA*, leading lawyer in Insurance: Insurer Firms (California) (2004–2011)

- *Super Lawyers*, Southern California (2004–present)

*Best Lawyers*, leading lawyer in Bet-the-Company Litigation, Commercial Litigation and Insurance Law (2005–2012)

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): _____
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be
served in the manner stated below:

**1.    SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling
General Orders and LBRs, the foregoing document was served on the following persons by the court via
NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are
currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive
NEF transmission at the email addresses stated below.

**Simon J Dunstan** Email: hughesanddunstan@gmail.com
**KirstenAMickelson** Email: Kirsten.mickelson@sedgwicklaw.com
**Robert S Gebhard** Email: robert.gebhard@sedgwicklaw.com

☐  Service information continued on attached page

**2.    SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this
judgment or order was sent by United States mail, first class, postage prepaid, to the following persons
and/or entities at the addresses indicated below:

**Alan I Schimmel 1**5303 Ventura Blvd #650 Sherman Oaks, CA 91403-3145
**Gregory H. Halliday** Sedgwick LLP 3 Park Plaza, 17th Floor Irvine, CA 92614-8540

☒  Service information continued on attached page

**3.    TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment
or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete
copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email
and file a proof of service of the entered order on the following persons and/or entities at the addresses,
facsimile transmission numbers, and/or email addresses stated below:

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## SERVICE LIST

David Gottlieb
15233 Ventura Blvd. 9th Floor
Sherman Oaks, CA 91403

Leonard Shulman
26632 Towne Center Drive Suite 300
Foothill Ranch, CA 92610-2814

Victor Sahn
333 S. Hope Street 35th Floor
Los Angeles,  CA 90071

Bruce Celebrezze
333 Bush Street 30th Floor
San Francisco, CA 94104-2834

Terri Dykstra
2672 Ladbrook Way
Thousand Oaks, CA 91361

Lenny Dykstra
10550 Wilshire Blvd. #1203
Los Angeles, CA 90024

Evan Sorensen
18100 Von Karman Ave. Suite 800
Irvine, CA 92612

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9021-1.1.NOTICE.ENTERED.ORDER**